**People of the State of Illinois, Defendant in Error, v. Levi Westbrook, Plaintiff in Error.**

**Gen. No. 49,869.**

First District, Third Division.

February 18, 1965.

Sheldon S. Grauer, of Chicago, for plaintiff in error.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Paul A. O'Malley, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

Defendant was tried and convicted on a charge of murder. He was sentenced to not less than fourteen years and not more than fourteen years and one day.

He is an indigent. The Supreme Court of Illinois appointed counsel for him and thereafter transferred his appeal to this court. Defendant makes three points: (1) the court improperly instructed the jury upon the definition of the crime, in that the statute quoted was not in effect at the time of the occurrence or at the time of the trial, having been superseded by the Criminal Code of 1962; (2) the court unduly restricted the cross-examination by defense counsel of the state's witness Catherine Hall, in not allowing the introduction of certain impeaching testimony; and (3) the evidence introduced at the trial failed to prove defendant guilty of murder beyond a reasonable doubt.

On August 8, 1962, Catherine Hall was watching television in the apartment of her friend Mrs. Levora Carter, at 4545 South Woodlawn Avenue, Chicago, Illinois. At about two o'clock in the afternoon, Albert Woods, a man in his thirties, knocked at the door of the apartment and asked to see Miss Hall, who later testified that she had known him about six years. Levora Carter testified she had known Woods since he was a child. Catherine Hall and Woods went to her apartment, which was across the hall and a short distance from Mrs. Carter's apartment. Mrs. Carter followed them down the hall, but after a few minutes returned to her own apartment.

Catherine Hall's apartment consisted of one room, about 12′x20′, and a Pullman kitchen at one end. It contained a bed, a small couch near the window, a dresser and a radio and phonograph. Miss Hall testified that Woods sat on the couch near the window while she went into the kitchen to open some cat food and to get a beer. Because the kitchen door obstructed her view, she did not see the defendant enter the apartment. She testified that she and Woods had been there about eight or nine minutes before Westbrook came in. Catherine Hall and Levi Westbrook had

lived together as man and wife for a year, from March 1961 to about March 1962, at 5716 South Wabash Avenue, Chicago. She testified that he was not living with her on August 8, 1962, but that he had a key to her apartment and came there three or four nights a week. She further testified that when she did look around, she saw that Westbrook had grabbed Woods and asked him what he was doing in his house. In demonstrating to the jury what Westbrook had done, she said "He was down over him with his coat like this, doing like this when I ran out." For the record, it was stated that the motion Westbrook made "is a hand approximately the hip length going back and forth" (obviously these words were intended to describe the motion of a knife being used to stab); that she did not see anything in his hand. She testified that she ran out of her apartment and to Mrs. Carter's apartment. Four or five minutes later, Westbrook came down the hall and saw Mrs. Carter.

Mrs. Carter testified that Westbrook asked her if Catherine was there; that he had a knife in his hand; and that she told him Catherine was not there. He then returned to Catherine Hall's apartment. While he was talking to Mrs. Carter, she saw Woods walk down the hall and down the stairs to the street. She locked Miss Hall in her apartment and she also went down the stairs to the street. She later saw defendant Westbrook come out of the building and walk east on 46th Street until he was apprehended by Officer Townsend.

Townsend testified that he and his partner Vincent Ford were driving east in a patrol car on 46th Street when they saw Woods leaning against a wall in the alley behind Woodlawn Avenue, just north of 46th Street. Woods, holding his stomach, told them he had been stabbed by a man he didn't know at 4545 South Woodlawn Avenue; that he left Woods while Officer Ford went to get an ambulance and he, Townsend,

went around the corner, where a woman pointed out Westbrook walking down Woodlawn Avenue and then east on 46th Street toward Lake Park Avenue. Officer Townsend caught up with Westbrook, told him to halt, searched him, found a knife, and asked "Is this what you stabbed him with?" and Westbrook said, "Yes." Officer Ford then drove up in the squad car and they took Westbrook back to the alley where Albert Woods lay. The patrol had arrived and Woods was on a stretcher. When the two patrolmen took Westbrook up to Woods, Townsend asked Woods, "Is this the man who stabbed you?" and Woods answered, "Yes, that is the man." Westbrook attempted to reach Woods on the ground, and Officer Townsend asked "Are you trying to kill this man?" Westbrook replied, "I kill you too if I caught you on top of my wife."

The defendant testified that he was 34 years old; that he lived with Catherine Hall at 4545 South Woodlawn Avenue; that he stayed there the night of August 7, 1962; that on the afternoon in question, when he walked into the apartment, he saw Woods in bed with Catherine Hall; that Catherine was undressed and Woods had on only his shirt. He asked, "What are you doing here in bed with my wife?" Woods did not answer and Westbrook asked Catherine Hall whether she didn't think enough of herself to let him take her to a hotel. The defendant testified that Woods got up, took his shoes, and started for his pants which were on a chest of drawers. Westbrook had his arm across the chest of drawers, and he threw Woods his pants and told him to get out of his house. Woods put on his pants and then sat down on the bed. Westbrook walked over to the bed, reached around Woods, and caught hold of Catherine's arm to pull her out of bed.

According to Westbrook, Woods was the aggressor. Woods struck him, kicked him, and knocked him down. Catherine got up and ran out of the apartment and

64

Woods came after Westbrook with a knife. In the struggle Woods struck Westbrook in the shoulder and cut his hand. After Woods lost the knife in the struggle, he began to choke Westbrook. Westbrook went limp, ran his hand into his pocket, got his knife, and began to hit Woods in the stomach. Woods then got up off him. Westbrook testified there was not a word spoken between the two men, and that he had never seen Woods before in his life. The defendant said that he then went down the hall to see if he could find Catherine. While he was talking to Mrs. Carter, Woods came out of Catherine Hall's apartment with his coat over his shoulder and went down the hall. Mrs. Carter said no, that she did not stop Catherine, and Westbrook said that she could not have gone far because she was naked. Mrs. Carter then locked her apartment door behind her and went down the hall behind Woods. Westbrook went back to the apartment and changed his shirt. He testified there was a .38 revolver in the chest of drawers. He then went out in the street looking for Catherine, when he was arrested by Officer Townsend. The rest of Westbrook's story is substantially similar to that of the other witnesses, except that he denied he ran away from Officer Townsend and denied that he kicked at Woods when he was on the ground or said "I kill you too if I find you on top of my wife."

Catherine Hall and Levora Carter both testified that Catherine and Albert Woods were fully dressed at all times and that they were not in bed. The police testified they did not find a knife in the apartment nor the white shirt which defendant claimed he had changed. There were spots of blood on both the sofa and bed. They testified that clothes hanging in the closet were cut with a knife, as were the cords on the phonograph and radio. They further testified that at no time did Westbrook complain of any stab wounds,

65

and Catherine Hall testified that a shoulder scar which Westbrook said was a knife wound made by Woods was actually administered by her on May 23, 1962, when she "put it on him" with a pair of scissors.

Defendant contends, first, that the court improperly instructed the jury upon the definition of murder, in that the statute quoted in the instructions was not in effect at the time of the crime or at the time of the trial, having been superseded by Section 9–1 of the 1961 Criminal Code (Ill Rev Stats, c 38, § 9–1 (1963)), which became effective as of January 1, 1962. The provision of the Code is as follows:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the act which causes his death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than voluntary manslaughter."

Instruction No. 11, which defendant sets out in his brief, is as follows:

"The court instructs the jury, in the language of the statute, that murder is the unlawful killing of a human being, in the peace of the people, with malice aforethought, either expressed or implied. The unlawful killing may be perpetrated by stabbing with a knife or by any other of the various forms or means by which human nature may be overcome, and death thereby occasioned.

"Express malice is that deliberate intention unlawfully to take away the life of a fellow

66

creature, which is manifested by external circumstances capable of proof. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart."

Defendant argues that this instruction was not accurate, did not describe the crime of murder and has a tendency to mislead the jury, and is therefore prejudicial error.

■ Before considering the merits of this argument, we will examine the point made by the state that defendant is barred from raising the alleged errors in the instructions because the report of proceedings does not show who tendered the instructions, whether they were given or refused, and whether they have the proper notations. Supreme Court Rule 25 provides that instructions in criminal cases shall be tendered, settled and given in accordance with Section 67 of the Civil Practice Act (Ill Rev Stats c 110, § 101.25 (1963)); People v. Knutson, 17 Ill App2d 251, 149 NE2d 461. Section 67 of the Act provides that "An original and one copy of each instruction asked by any party shall be tendered to the court. The copies shall be numbered and shall indicate who tendered them. Copies of instructions given on the court's own motion or modified by the court shall be so identified." There can be no question that this provision is important to the orderly review of any case, and failure to follow it is an important technical error, sufficient to bar a defendant from making any argument with respect to the instructions. Considering the gravity of the case before us, however, we have concluded to examine the merits of the defendant's argument.

■ ■ The change in the new law was intended only to put in more simple terms the same legal principle as the old, and particularly to eliminate the "malice" language which was considered "difficult."

This is borne out by an examination of the report of the committee which drafted the 1961 Criminal Code. The report defined the purpose of the change as follows: "Section 9–1 is intended to define the types of conduct which constitute murder, as indicated by the Illinois cases, but to avoid the use of difficult 'malice' language." Hundreds of men have been convicted of murder under the old definition, and even if we assume that the language of the new is more desirable, it does not follow that it was error to give the old. In the instant case the only real issue was that of self-defense, and in no substantial way does the instruction given hamper the defendant in making that defense.

██ Defendant also contends that the court unduly restricted cross-examination of the state's key witness Catherine Hall with respect to testimony given by her at the coroner's inquest which allegedly impeached her testimony given at the trial and hereinbefore set forth, to wit: that she was in the Pullman kitchen when Westbrook walked in the room and that she did not see the actual stabbing. Her testimony at the coroner's hearing was as follows:

"Q. What is your apartment?

A. 218.

Q. Go on.

A. I unlocked the door and said [to Woods], 'have a seat.'
He was talking about some kids that come to my house all the time and said something about what the lady was saying about it. *At the time Levi Westbrook came into the room I was standing behind the kitchen door opening a can,* and he went over to this Albert Woods and asked: 'What are you doing in here with my wife?' He never saw the man before and didn't know him at all.

He didn't give him a chance to say anything, just grabbed him. I broke and ran because I was afraid. I had been in the hospital two months because of him and I ran to Mrs. Carter's house at 222 and told her to tell him I wasn't there and five minutes later he came knocking on the door. I could hear him and he didn't see me. . . .

. . . . . .

Q. Now did you see the defendant here actually cut the deceased?

A. No, I didn't see it but on the side of my bed there was some blood and this Albert Woods' cigarette was on the floor where he had been struggling and I have blood on the rug. *I was laying on the foot of the bed and didn't see it."* (Emphasis supplied.)

That portion of Catherine Hall's testimony at the inquest that she was lying at the foot of the bed is contradictory of her testimony at the trial as to just where she was when Westbrook grabbed Woods, but we do not consider the court's ruling to be reversible error. There is no doubt that Westbrook was the aggressor and stabbed Woods. The vital issue is whether he killed Woods in self-defense. The evidence given by witnesses other than Miss Hall, that is, Mrs. Carter and the police officers, all sustains the state's argument that the defendant was the aggressor, that he had a knife, that the victim met his death by stab wounds in his back and abdomen, and that the defendant admitted to the officers who arrested him that he had stabbed Woods; that he said to the officers, "I kill you too if I caught you on top of my wife"; that there were no bruises, cuts or lacerations on the defendant; that there was blood on the bed and sofa in Miss Hall's apartment; that the knife which Woods

allegedly had and dropped was never found; and that the white shirt was not found.

Catherine Hall testified consistently that she did not see the actual cutting, and at the trial she testified that she saw "a hand approximately the hip length going back and forth." It is in the very nature of the crime that the defendant, outraged by the alleged conduct of his supposed common-law wife and driven by jealousy, should be the aggressor. Woods had never seen Westbrook before and no motive is given why he should have been the aggressor. The evidence establishes Westbrook's guilt beyond all reasonable doubt.

Judgment affirmed.

DEMPSEY, P. J. and SULLIVAN, J., concur.